NOTICE: All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports. If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

11-P-1583                                          Appeals Court


        BERNARD BULWER vs. MOUNT AUBURN HOSPITAL & others.[1]


                        No. 11-P-1583

    Middlesex.     November 26, 2012. - September 24, 2014.

    Present: Berry, Kafker, Meade, Sikora, & Wolohojian, JJ.[2]


Hospital, Appointment to staff. Anti-Discrimination Law, Race.
    Employment, Discrimination, Retaliation. Contract,
    Employment, With hospital, Performance and breach,
    Interference with contractual relations. Libel and
    Slander. Unlawful Interference. Practice, Civil, Summary
    judgment.



    Civil action commenced in the Superior Court Department on
February 22, 2008.

    The case was heard by S. Jane Haggerty, J., on a motion for
summary judgment.

_____

        [1] Eric Flint, Ricardo Wellisch, and Lori Balestrero.

        [2] This case was initially heard by a panel comprised of
Justices Meade, Sikora, and Wolohojian. After circulation of
the opinion to the other justices of the Appeals Court, the
panel was expanded to include Justices Berry and Kafker. See
Sciaba Constr. Corp. v. Boston, 35 Mass. App. Ct. 181, 181 n.2
(1993). Justice Sikora participated in the deliberation on this
case and authored his separate opinion prior to his retirement.

Sara Discepolo for the plaintiff.
Robert R. Hamel, Jr., for the defendants.

WOLOHOJIAN, J.   The plaintiff, Dr. Bernard Bulwer, an experienced physician and a black man from Belize, became a first-year resident at Mount Auburn Hospital (hospital) in August, 2005.  He joined the residency program under a one-year contract, with the possibility of advancement to a second year of residency upon successful completion of the first.  Eight months into the program, he was told that the hospital would not extend a second-year contract to him but that he would be allowed to continue his residency through the end of his first year.  One month later, however, he was terminated.  This suit followed, in which Bulwer alleges discrimination and retaliation based on his race and national origin in violation of G. L. c. 151B, breach of contract, defamation, and tortious interference with his contractual relationship with the hospital.[3]  Summary judgment entered in favor of the defendants on all counts.  We conclude that the summary judgment record sufficed to entitle Bulwer to have a jury decide his discrimination and breach of contract claims, but that summary

---

[3] Bulwer also asserted claims for breach of health insurance obligation, and intentional and negligent emotional distress. However, he raises no issue on appeal with respect to the adverse summary judgment ruling on those claims.

judgment was properly entered on his remaining claims. Accordingly, we affirm in part and reverse in part.

1. The summary judgment record. In reviewing a grant of summary judgment, we assess the record de novo and take the facts, together with all reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. Godfrey v. Globe Newspaper Co., 457 Mass. 113, 119 (2010). "[T]he court does not pass upon the credibility of witnesses or the weight of the evidence [or] make [its] own decision of facts." Shawmut Worcester County Bank, N.A. v. Miller, 398 Mass. 273, 281 (1986), quoting from Attorney Gen. v. Bailey, 386 Mass. 367, 370 (1982). Viewing the facts in this light, we then determine whether the moving party has affirmatively shown that there is no real issue of fact, "all doubts being resolved against the party moving for summary judgment." Ibid. The record at hand, viewed with these principles in mind, showed the following.

a. Bulwer's background and the hospital's residency program. Bulwer is a black male of African descent whose nation of origin is Belize. In the spring of 2005, he contacted the hospital to inquire about a possible position in its internal medicine residency program. The director of the program, Dr. Eric Flint, interviewed Bulwer and believed him to be personable and capable. Flint followed up on the interview by verifying

Bulwer's previous professional experience and confirming that he had performed satisfactorily at those positions. Based on his favorable impressions and the satisfactory results of his due diligence, Flint recommended that Bulwer be accepted into the program.

Bulwer was not a typical applicant to the hospital's residency program because he was already an experienced physician. Before joining the program, Bulwer had sixteen years of professional experience as a physician, and had certified postgraduate specialist training in nutrition, diabetes and metabolic medicine, cardiovascular disease, and echocardiography. He had authored or coauthored three books, and had over forty scientific publications.

The first year residency program typically consists of twelve one-month rotations, and there are forty-two residents in the program in any given year. The program is accredited by the Accreditation Counsel for Graduate Medical Education (ACGME) and governed by that organization's requirements. As pertinent here,[4] the ACGME required that:

"e. Conditions for reappointment;

---

[4] The ACGME also required that "ACGME-accredited programs must not discriminate with regard to sex, race, age, religion, color, national origin, disability, or veteran status." This requirement does not appear to add anything of substance to G. L. c. 151B.

"(1) Nonrenewal of agreement of appointment:  [The hospital] must provide a written institutional policy that conforms to the following:  In instances where a resident's agreement is not going to be renewed, [the hospital] must ensure that its ACGME-accredited programs provide the resident(s) with a written notice of intent not to renew a resident's agreement no later than four months prior to the end of the resident's current agreement.  However, if the primary reason(s) for the nonrenewal occurs within the four months prior to the end of the agreement, [the hospital] must ensure that its ACGME-accredited programs provide the residents with as much written notice of the intent not to renew as the circumstances will reasonably allow, prior to the end of the agreement.

"(2) Residents must be allowed to implement the institution's grievance procedures as addressed below if they have received a written notice of intent not to renew their agreements.

"f. Grievance procedures and due process:  [The hospital] must provide residents with fair and reasonable written institutional policies on and procedures for grievance and due process.  These policies and procedures must address

"(1) academic or other disciplinary actions taken against residents that could result in dismissal, nonrenewal of a resident's agreement or other actions that could significantly threaten a resident's intended career development; and,

"(2) adjudication of resident complaints and grievances related to the work environment or issues related to the program or faculty."

Bulwer entered into a one-year medical resident agreement (agreement) with the hospital covering the period of August 29, 2005, to August 28, 2006.  The agreement provided that the hospital agreed to comply with the ACGME requirements.  As noted above, one of those requirements was that the hospital have written grievance and due process policies, which it did.

Certain of those policies are relevant to Bulwer's claims, and we set them out here:

"4. . . . In instances where a resident's agreement is not going to be renewed, the training program will provide the resident with written notice of intent not to renew a resident's agreement no later than four months prior to the end of the agreement. . . . Residents are allowed to implement the due process procedure as addressed below if they have received a written notice of intent not to renew their agreements.

". . .

"II. Due Process Procedures:

". . .

"Upon request by a resident, program director, member of the teaching staff, administration or patient for review of an issue under the scope of this policy an Ad Hoc Committee will be assembled.

"Composition:

"The Ad Hoc Committee will be composed of the ACGME Designated Institutional Official/Director of Medical Education, the Chairs of the Departments of Medicine and Radiology, the Program Directors of the training programs in Medicine and Radiology, the houseofficer, and a houseofficer representative that is mutually agreed upon by the Director of Medical Education and the houseofficer under discussion.

"Fair Hearing:

"The resident is assured of the fundamental aspects of a fair hearing including written statement of the specific issues from the Department Chair, at least 5 days notice of the Due Process Committee meeting, the opportunity to be present and to rebut the evidence, and the opportunity to present any other information.

". . .

"All matters upon which any decision is based must be introduced into evidence at the proceeding before the Ad Hoc Due Process Committee in the presence of the resident. . . . Appeal of the decision of the hearing is limited to matters introduced at the hearing and made available to the resident."

b. Bulwer's performance in the program. Under this contractual framework, Bulwer began his residency. His first rotation was in the emergency department, where he received strong evaluations. For example, at least two physicians evaluated Bulwer as "outstanding" during this rotation, and commented that "Dr. Bulwer . . . knows more cardiology and has better echo skills than I do, [is] professional, enthusiastic, [gives] great presentations, [and is a] pleasure to work with." Five others rated him "above average," commenting that he was "knowledgeable, responsible, [and had a] pleasant demeanor[, and e]xcellent work ethic," that he was "very good, works hard [and is] excited to be at work and looks to improve every shift," that he "[w]orks hard[, is a] [w]onderful person[, and g]reat with patients and staff," and that he is" [v]ery knowledgeable, extremely hardworking and conscientious[, and h]as great rapport with fellow physicians and staff."[5] He was assessed to be mature and a pleasure to work with. Significantly, Dr. Gary Setnik, head of the emergency department, in response to a

_____

[5] Two others rated him "average," also noting Bulwer's positive work habits.

request that he assess Bulwer's performance over a period of months in the emergency department wrote:

> "Dr. Bulwer is universally held in high regard by the staff I polled and by myself.  He has been totally reliable, coming in early, and staying late on most shifts.  He aggressively works to see as many patients as possible.  His presentations are complete, his management plans appropriate, and his procedural skills very good.  Aside from some very minor documentation issues, and his failure to assure that the admitting resident was called on one case, his performance has been outstanding.  He is in the top 10% of the medical houseofficers who have rotated in the E[mergency] D[epartment] over the last several years."

By contrast, Bulwer's evaluations during his next rotation through the medicine intensive care unit (MICU) were not of the same sort.  In that rotation, he received three strongly negative evaluations.  That said, the assessment of Bulwer's performance in the MICU was not uniform.  Dr. Soon-Il Song reported a positive view of Bulwer's performance in the MICU:

> "His strengths were that he had procedural skills and knowledge base well above someone at an intern level.  He also was pleasant to work with.  He had a good sense of his own limitations, and asked questions often in order to clarify issues.  I think his ability to gather information in history taking was quite good and thorough.  Above all, he maintained composure and a good attitude, despite the fact that we had an especially difficult night of no sleep and challenging patients requiring multiple attending input in the middle of the night."

During October of 2005 (the same month of Bulwer's MICU rotation), the first-year residents at the hospital (like other first-year residents nationally) were required to take a national standardized test designed to test their medical

knowledge relative to their peers.  Bulwer scored in the top third nationally on that test, and his results were consistent with those of his peers at the hospital.

On October 26, 2005, Bulwer sent an electronic mail message (e-mail) to Flint, the director of the internal medicine residency program, to address the negative comments Bulwer had received during his MICU rotation.  Bulwer did not believe those reviews were objective and asked Flint to obtain a more objective view of his performance by speaking with the physicians with whom he had actually seen patients:  Drs. Hayat, Song, Tillinger, and Brady-Joyce.  Flint did not speak with any of those individuals, even after Bulwer again expressed to Flint he felt that he was not being assessed objectively.

Bulwer was not alone in this view of the MICU's evaluation of his performance.  Setnik, the chair of the emergency department, reported that the MICU team was unnecessarily critical of Bulwer and also that the MICU staff had harshly attacked members of the emergency department for favorably evaluating Bulwer's performance:

> "It was about the same time that he was having difficulty in the [MICU] that we were criticized very heavily by members of the [MICU] team, and when I say we I mean the entire E[mergency] D[epartment] staff, and some of them unbelievably harshly.  An experience that I hadn't previously had at Mount Auburn, to be honest with you and I have collected the emails and I could share then with you, but they are really quite harsh, and that led to a whole series of other discussions that we had and a reflection

about maybe thinking that [Bulwer] had entered an area that was going to be a little bit more critical than it needed to be for a person in his circumstances, just and not having had clinical medicine for a while and the like."

On November 15, 2005, Dr. Lori Balestrero (who was Bulwer's adviser for the residency program) met with him to discuss the feedback received on his performance in the MICU rotation. Bulwer again responded that he did not believe that the feedback was accurate. On December 1, 2005, Balestrero again met with Bulwer, after having met with the clinical competence committee (CCC) to identify areas in which Bulwer needed to improve. These areas were presented as part of a six-point plan that included meeting with his adviser weekly to review Bulwer's progress. Those meetings did not occur. Similarly, although the action plan called for a follow-up meeting between Bulwer, Balestrero, and a CCC representative after the December evaluations were received, that meeting too did not occur.[6]

Bulwer next rotated into "wards," where several evaluations of his performance were on the whole positive, although they also noted some areas of weakness. One such evaluation read, "Great job! Very bright/knowledgeable. Be concise, people get lost sometimes lo[]sing the big picture of the story you are

---

[6] Bulwer contends that these meetings did not occur because of Balestrero's schedule, while she contends the opposite. On summary judgment, this dispute must be resolved in favor of Bulwer.

telling.  Much improvement seen!"  Song, who supervised Bulwer

directly, gave the following detailed assessment of Bulwer's

performance during his wards rotation, responding specifically

to the areas of concern raised during the MICU rotation:

"1. . . . Bernard's ability to interpret and analyze clinical data, and formulating a plan of management is excellent and in the 10% of the intern class.  His presentations on wards work rounds are methodical, to the point, and effective.

"2. . . . He has a good sense of humor and speaks <u>even of those who have criticized him</u> with respect.  The main issue here I think is that his behavior has been <u>misconstrued in the past as arrogance in his zeal to impart instruction</u>. However, he has demonstrated nothing but caring, concern, and team spirit this month on wards.  His interactions with nursing and patients in my observation demonstrated no serious deficiencies requiring me to give feedback to him.

"3. . . . I have been mindful when I visit Bernard's patients to assess their subjective and emotional responses to his presence in the room.  These are the more intangible things which may be difficult to quantify, but at no time have I sensed tension on the part of Bernard's patients toward him.  I have on several occasions observed him interacting with patients when he was initially unaware of my presence and I have come to the same conclusion.  It is difficult for me to understand past allegations in this regard, and if true, certainly do not leave their residue today.

"4. . . . In honesty, there are a few times when I felt the need to give constructive criticism to Bernard.  I believe the manner in which feedback is given is important with any scenario.  I get the impression that Bernard may be sensitive to feedback given in a humiliating manner.  My approach has been to give feedback in the spirit of gentleness, and of emphasizing ensur[ing] of proper patient care.  With this approach, I have had no problems with Bernard, as I interact with him as one professional colleague to another, and he understands this approach as my particular style.

"In sum, Bernard has areas of weakness and strength as any other intern.  But as an intern, I have seen residents with far less clinical acumen and interpersonal skills graduate from the program."[7]

By contrast, Dr. Erica Bial considered Bulwer's performance during his wards rotation to be "horrendous."  There is evidence in the record, however, to suggest that Bial had acted inappropriately towards Bulwer, including berating him in public in an inappropriate way, with her "voice raised and . . . speaking continuously" without permitting Bulwer to respond.

When Bulwer met with his adviser, Balestrero, on January 18, 2006, to review his progress, she stated that he had received good reports and that "the past [was] behind [him]." This was the first and last meeting Balestrero had with him concerning his progress after December 1, 2005, when he had been told he would have weekly progress meetings with her.

Bulwer next rotated into cardiology, where two reviewers gave him highest marks, and one reviewer gave him mixed marks. The only narrative review provided for that month read:

"[Bulwer] worked well [with] team this month.  He repeatedly brought in articles to support his presentations & teach team.  This is very commendable.  Could have a little more poised presentations (ie: why is p[atien]t in

---

[7] Song also reported that another physician in the MICU had also had reported that she never had any problems with Bulwer's performance, that he did a very good job, and that he "tucked his patients in tightly" (a phrase apparently meaning that he left no loose ends).

the hosp[ital]/what's keeping him/her here?). Cardiology knowledge base is excellent! Would encourage ↑ [greater] communication [with] nurses to make sure everyone is in the loop."

Outside of these rotations, Bulwer also received favorable reviews for his performance in the continuity clinic and from Dr. Ramona Dvorak, the director of consultation-liaison psychiatry at the hospital:

"I have been impressed with Dr. Bulwer's thorough knowledge of the medical issues arising with his patients. He always gives me a complete, well organized and well thought out presentation of the case. He puts forth a psychological formulation of his impressions or concerns that demonstrate an astute integrative style in which he considers many levels of the patient's situation. I have always found him to be extremely engaging, personable, open, extremely bright, articulate and willing to learn. He is verbal, active in teaching rounds, and brings up sensitive and essential cultural and psychosocial issues that many trainees at his level do not consider when thinking of patients. He is an independent thinker, yet I have found him to take in feedback well and add an interesting personal and cultural dimension to patient care. I feel that his unique cultural and clinical background has enriched learning experiences with his peers and with patient care that has made an important contribution to the Mount Auburn Hospital milieu."

c. Adverse employment actions and Bulwer's appeal from them. On March 17, 2006, Flint told Bulwer that he would not be promoted because his work was not up to the standard required of a first-year resident in the areas of patient care, especially complex cases, and communication around cases. Bulwer questioned the quality of the feedback on which the decision was

based and wanted to acquire additional points of observation, and a follow-up meeting was scheduled for the next week.

On April 5, 2006, Bulwer was formally notified by Flint that his contract would not be extended for a second year because of concerns in the areas of patient care, interpersonal and communication skills, and practice-based learning (i.e., the ability to gain insight from feedback). These concerns were based on observations "some of which have been documented and some of which have not."

Bulwer was informed of his right to appeal the decision under the ACGME requirements, and he was provided with a copy of the hospital's "Houseofficer Evaluation/Grievance/Due Process Policy" which contained the provisions set out above. Bulwer invoked his right to appeal and, as a result, an ad hoc appeal committee (ad hoc committee) was established. That committee met and deliberated on three occasions, April 24, May 2, and May 9, 2006. Bulwer was present only at the first; he was not invited to attend the second and third days of the hearing, nor did he receive any of the materials submitted those days despite his request. Extensive -- and important -- testimony concerning his performance was heard during the second and third sessions. For example, Balestrero testified extensively during the second day of the hearing, and the ad hoc committee members' discussion after her testimony demonstrates that it affected their view of

the case. The ad hoc committee also heard from Dr. Carey Thomson and from Setnik, who both gave substantive evaluations of their experiences working with Bulwer, and from Dr. Ricardo Wellisch, chair of the CCC, who did the same. The evidence before the ad hoc committee was not uniformly critical of Bulwer, and indeed, there was some praise of his work. At the end of the second day of the hearing, Dr. Charles Hatem, the chair of the ad hoc committee, commented that "it is interesting how one set of behaviors can elicit such different perception," and he determined that additional discussion and thought would be necessary to reach a conclusion about Bulwer.

The record does not contain a transcript of the third ad hoc committee meeting. However, after the third session, the ad hoc committee confirmed the decision of the CCC not to extend Bulwer's contract for a second year for the same reasons articulated by Flint,[8] and a letter dated May 17, 2006, from Dr. Stephen Zinner, chair of the department of medicine, so informed Bulwer.

Also on May 17, the hospital terminated Bulwer, effective immediately, for

> "serious additional concerns about his performance [that] have arisen over the past 3 weeks while his review was in

---

[8] The hospital notified Bulwer of his right to appeal the decision of the ad hoc committee, which he did, although it appears he did not follow the proscribed procedure.

> progress[.] Dr. Flint made the decision that in the interest of patient safety at Mount Auburn Hospital, Dr. Bulwer should be immediately relieved of his responsibilities as a medical intern."

The record does not reflect that immediate termination was ever formally made a part of the ad hoc committee process or that the additional patient safety issues were discussed by that committee. (No mention of them is in the transcripts of the first or second sessions). Instead, the decision to terminate Bulwer was made after the last meeting of the ad hoc committee. Indeed, the hospital admits that Bulwer was never informed that the ad hoc committee was considering terminating him due to alleged patient safety risks. The hospital also admits that the first Bulwer learned of this possibility was when he was notified of his termination.

d. Posttermination events. On May 17, 2006, Flint sent a mass e-mail to employees of the hospital informing them that Bulwer had been terminated. He concluded the e-mail: "The decision was clear. Yet the need to take this action was most unfortunate and the consequences for Dr. Bulwer's future are large. I wish him the best in his future endeavors and I hope he finds a career path that is best suited to his strengths."

The next day, Flint sent another group e-mail, this time to all residents:

"Some of you may have heard that Bernard Bulwer is no longer working with us in our program, so I wanted to offer a few words regarding this.

"The Clinical Competence Committee (CCC, made up of all the docs that serve as advisors) meets from time to time to review performances of all residents.  Over the winter, the issues regarding Dr. Bulwer were discussed and shared with him in a way that was supportive and geared towards allowing him to use the feedback constructively to improve.  After a time, with no improvement noted in key areas, a decision was made not to continue him in the program.

"According to our program's policy and in accordance with ACGME requirements, Dr. Bulwer appealed this decision. An ad hoc committee chaired by Dr. Hatem and including members of other departments reviewed the CCC concerns, allowed Dr. Bulwer to offer his perspective and supporting materials, reviewed his records and patient care activities to date, and after all that decided to support the CCC decision not to continue him in the program.

"The decision was clear.  There was much deliberation both by the CCC and during the appeals process.  It is difficult to take this action because of the consequences for Dr. Bulwer going forward.  I personally and on behalf of all the staff in the Department of Medicine wish him success in the future in a career path best suited for his strengths."

The hospital also reported Bulwer's termination to the Board of Registration in Medicine.  The hospital did not give patient safety as its reason for the termination; instead, it represented that Bulwer had been terminated for "[f]ailure to make appropriate progress in processing and applying evaluations and other constructive criticism and feedback to patient care responsibilities."

We reserve additional facts to the discussion below.

2.  Discussion.  We review a grant of summary judgment de novo, with "no deference to the decision of the motion judge." DeWolfe v. Hingham Centre, Ltd., 464 Mass. 795, 799 (2013).  The defendants, as the moving parties, "have the burden of establishing that there is no genuine issue as to any material fact and that they are entitled to judgment as a matter of law." Ibid.  The moving party may satisfy its burden by demonstrating that the opposing party has no reasonable expectation of proving an essential element of the case at trial.  Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).  "Once the moving party establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts establishing the existence of a material fact in order to defeat the motion."  SCA Servs., Inc. v. Transportation Ins. Co., 419 Mass. 528, 531 (1995).

a.  Discrimination claim.  "In employment discrimination cases alleging disparate treatment, we allocate the burden of producing evidence according to the framework set forth by the United States Supreme Court under the Federal antidiscrimination provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. (1994).  Under this framework, the plaintiff bears the initial burden of establishing a prima facie case of racial discrimination.  Once the plaintiff meets this burden, unlawful discrimination is presumed.  The burden then

shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its hiring decision, and to produce credible evidence to show that the reason or reasons advanced were the real reasons. The defendant's burden of production is not onerous. The reasons given for a decision may be unsound or even absurd, and the action may appear arbitrary or unwise, nonetheless the defendant has fulfilled its obligation. The defendant is not required to persuade the fact finder that it was correct in its belief. Once the defendant meets its burden, the presumption of discrimination vanishes, and the burden returns to the plaintiff to persuade the court, by a fair preponderance of the evidence, that the defendant's proffered reason for its employment decision was not the real reason, but is a pretext for discrimination. The plaintiff bears the burden of persuasion on the ultimate issue of discrimination, and therefore must produce evidence sufficient to support a jury verdict that it was more likely than not that the articulated reason was pretext for actual discrimination. If the defendant's reasons are not discriminatory, and if the plaintiff does not prove that they are pretexts, the plaintiff cannot prevail." Matthews v. Ocean Spray Cranberries, Inc., 426 Mass. 122, 127-128 (1997) (quotations and citations omitted).

Our standard of review in discrimination cases based on disparate impact is the same as in any other summary judgment

case. <u>Sullivan</u> v. <u>Liberty Mut. Ins. Co</u>., 444 Mass. 34, 38-39
(2005). And, as in all other types of cases, the defendant, "as
the moving party, 'has the burden of affirmatively demonstrating
the absence of a genuine issue of material fact on every
relevant issue, even if [the defendant] would not have the
burden on an issue if the case were to go to trial.'" <u>Id</u>. at
39, quoting from <u>Matthews</u> v. <u>Ocean Spray Cranberries, Inc</u>., 426
Mass. at 127.

The hospital accepted, for purposes of summary judgment,
that Bulwer had met his burden of demonstrating a prima facie
case of discrimination. And Bulwer does not seriously argue
that the hospital failed to meet its non-onerous burden of
articulating a legitimate reason for his termination.[9] In other
words, the first two steps of the burden-shifting framework are
not at issue.

Instead, the issue is whether the hospital met its burden
of establishing that there is no genuine issue of fact
concerning pretext.[10] See <u>Pederson</u> v. <u>Time, Inc</u>., 404 Mass. 14,

---

[9] Bulwer's appellate brief devotes only one and one-half
pages to the argument that the hospital did not meet its burden
on the second stage.

[10] The dissent incorrectly argues that the burden is on
"Bulwer to prove that [the defendant's] reason for termination
constituted a pretext concealing a discriminatory purpose."
<u>Post</u> at    . This is Bulwer's burden at trial, not on summary
judgment. The dissent's error is caused by its reliance on a

17 (1989) ("The party moving for summary judgment assumes the burden of affirmatively demonstrating that there is no genuine issue of material fact on every relevant issue, even if he would have no burden on an issue if the case were to go to trial"). See also DeWolfe v. Hingham Centre, Ltd., 464 Mass. at 799. Put another way, the defendant is entitled to summary judgment only if "the summary judgment record demonstrates that the defendant has shown that the plaintiff will be unable to prove at trial that the stated reason for terminating him was a pretext." Matthews v. Ocean Spray Cranberries, Inc., 426 Mass. at 129. Pretext, like other inquiries into the minds and motivations of men, is generally not appropriate for disposition on summary judgment. See Blare v. Husky Injection Molding Sys. Boston, Inc., 419 Mass. 437, 439 (1995), citing Brunner v. Stone & Webster Engr. Corp., 413 Mass. 698, 705 (1992). "Summary judgment is generally disfavored in cases involving employment discrimination because the question of intent requires a credibility determination." Godfrey v. Globe Newspaper Co., 457 Mass. at 119. See also Matthews v. Ocean Spray Cranberries, Inc., 426 Mass. at 127; Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 54 (1st Cir. 2000) ("[C]ourts

---

quotation from Lewis v. Area II Homecare for Senior Citizens, Inc., 397 Mass. 761, 765 (1986), which is an appeal from a trial, not summary judgment.

should exercise particular caution before granting summary judgment for employers on such issues as pretext, motive, and intent").  "[S]ummary judgment is disfavored in discrimination cases based on disparate treatment because the question of the employer's state of mind (discriminatory motive) is 'elusive and rarely established by other than circumstantial evidence'" (footnote omitted).  Sullivan v. Liberty Mut. Ins. Co., 444 Mass. at 38, quoting from Blare v. Husky Injection Molding Sys. Boston, Inc., supra.

There was sufficient evidence of pretext to withstand the defendants' summary judgment motion in this case.  Although there was certainly ample evidence that Bulwer's performance in the residency program fell short of expectations, there was also evidence that he performed well.  There was no dispute that he was a well-trained physician coming into the program, or that his fund of medical knowledge was sufficient.  His problems appear to arise in areas of performance less susceptible to objective measurement:  communication, ability to process criticism, and manner (whether with patients or staff).  There is room for much subjectivity when evaluating these areas.[11]  And it is particularly appropriate that a jury decide whether that

---

[11] It was for a jury to decide what Wellisch meant when he said Bulwer "is not supposed to be smart, he's supposed to gather information.  This is why all of this is happening."

subjectivity included racial bias given, for example, that Setnik, the chair of the emergency department, reported that he and members of his department thought that Bulwer was being criticized unfairly. He also testified that physicians who reviewed Bulwer favorably were treated harshly, behavior that was unprecedented at the hospital.

When Bulwer was informed of the criticisms against him, he repeatedly asserted that they were not objective and that other physicians with whom he worked should be asked their views. Flint did not follow up with those physicians. There was also evidence that Bial, who had a particularly negative view of Bulwer's performance, harbored animosity toward him and had behaved inappropriately toward him in public.

Moreover, there was evidence that Bulwer was not given the same remediation opportunities as other first-year residents who struggled in the program. Others were permitted to repeat rotations or to repeat the full year. Similarly, although the hospital gave Bulwer a six-point improvement plan that included weekly meetings with his adviser, those meetings never occurred. Dvorak's observation over her lengthy career at the hospital was "that non-minorities who have significant performance or behavioral issues in the institution . . . are given support, where people of color, in my opinion, have been treated much more harshly."

More broadly, Dvorak described "institutional racism" at the hospital. She described "white supremacist doctrine" left in the staff room, and that the hospital administration took inadequate action in response. She testified that a bumper sticker she had on her office door that read, "We are all one people in the world," was torn off, as was another that expressed a similar support of diversity. She testified that during her lengthy tenure at the hospital only two black physicians remained. The weight and credibility of Dvorak's testimony is clearly the province of the jury, not ours.

There is also evidence of how other residents fared in the program. The hospital typically has forty-two residents in any given year. Since 2000, three residents have been terminated from the program. Two were of African descent; one was Caucasian. In addition, "the hospital admits that another intern of African descent did not continue in the program."[12] It is for the jury to decide whether the fact that two-thirds of the terminated residents are of African descent is a pattern from which discriminatory animus can be inferred in the

---

[12] The hospital's claim it was not responsible for this physician's departure is open to dispute. Although that physician left the program after the Board of Registration in Medicine failed to renew his license, the hospital's negative feedback about his poor performance led to the board's action.

termination of Bulwer.[13]  Numeric evidence of how other members of the class fared at the hospital "are relevant, and may be properly introduced in a disparate treatment case . . . because . . . they may support an inference that the particular decision was tainted by an unlawful bias."  Lipchitz v. Raytheon Co., 434 Mass. 493, 509 (2001).  See Smith College v. Massachusetts Commn. Against Discrimination, 376 Mass. 221, 228 n.9 (1978) (statistical evidence can be probative on question of motive).  See also Sullivan v. Liberty Mut. Ins. Co., 444 Mass. at 46 n.16 (numeric evidence concerning composition of employees who were terminated "may help establish a prima facie case of discrimination, even in a disparate treatment case").

Irregularities in the ad hoc committee process could support an inference that it was not fair or that Bulwer was treated in an unusual fashion from which pretext could be inferred.  As discussed in more detail below, the hospital did not abide by its own rules or those required by the ACGME with

_____

[13] This is not statistical evidence as presented in the summary judgment record because the figures are not placed within a larger numeric context for comparison.  It is nonetheless evidence of the racial composition of the residents who have historically been terminated from the hospital's residency program.  On summary judgment, we are not entitled to disregard it.  If the case proceeds to trial -- as it should -- the hospital will have an opportunity to rebut the inference that can be drawn from this evidence by introducing additional information concerning the composition of the program and those who have been terminated from it.  The hospital (as it is entitled to), however, has chosen not to do so at this stage.

respect to the review process. Of particular significance, Bulwer was not allowed to be present for two of the three ad hoc committee meetings, and was not provided with the materials from those meetings despite his request. He was never informed that the ad hoc committee was considering terminating him for an issue relating to patient safety or given an opportunity to address or rebut the criticisms of his performance with respect to the patient at issue. Song, who tried to convey his positive view of Bulwer's performance to Flint, received the impression from Flint that "the train had already left the station" and that positive feedback about Bulwer would not make a difference.

Finally, shifting explanations for the hospital's actions could also support an inference of pretext. The hospital's position in the statement of undisputed facts on summary judgment was that it did not promote Bulwer because of "poor performance in the internal medicine department." Its "reason for immediately terminating Bulwer from employment that day was risk to patient safety." This, however, was not the reason the hospital gave to the Board of Registration in Medicine in a report the hospital was required by law to file within thirty days of Bulwer's termination. See G. L. c. 111, § 53B. Instead, the hospital stated that Bulwer was terminated because he "[f]ail[ed] to make appropriate progress in processing and applying evaluations and other constructive criticism and

feedback to patient care responsibilities."[14]  In short, when the summary judgment record is taken in the light most favorable to Bulwer, Drakopoulos v. U.S. Bank Natl. Assn., 465 Mass. 775, 777 (2013), without evaluating the credibility of witnesses or the weight of the evidence, McGuinness v. Cotter, 412 Mass. 617, 628 (1992), the record was sufficient to put the discrimination claim to the jury.

b.  Breach of contract.  Bulwer argues that the hospital breached its contractual obligations to him by (a) failing to comply with the ACGME's nondiscrimination requirement;[15] (b) failing to include a resident on the ad hoc committee, as required by the hospital's written due process procedures; (c) failing to provide him with advance notice of specific patients or allegations considered by the ad hoc committee; (d) failing to provide him with required resources and supervision; and (e) failing to provide him with an appeal from the ad hoc committee decision.  There was sufficient evidence in the summary judgment

---

[14] These various explanations can perhaps be reconciled. However, it is for the jury -- not us -- to resolve the conflict.

[15] The hospital's general promise of conformance with ACGME standards would incorporate by reference the ACGME requirements into the residency contract.  See Chicopee Concrete Serv., Inc. v. Hart Engr. Co., 398 Mass. 476, 478 (1986) ("incorporation by a clearly stated general reference will suffice").

record to support each of these arguments, with the exception of the last.[16]

First, the evidence supporting Bulwer's G. L. c. 151B discrimination claim as set forth above is, for the same reasons, sufficient to support his claim that the hospital breached the ACGME nondiscrimination policy. See note 4, supra. Second, it is undisputed that the ad hoc committee did not include a resident member as required by the hospital's due process policy. Third, it is undisputed that Bulwer did not receive any notice that the ad hoc committee was considering his immediate termination, nor does the record show that he was provided any of the information concerning the patient whose care precipitated the hospital's decision to terminate him immediately. Instead, Bulwer was informed that the decision to terminate him was based on "additional" information that came to light during the review process, and there is no indication that that information was disclosed to Bulwer before his termination or that it was discussed during any of the three meetings of the ad hoc committee. Indeed, the decision to terminate Bulwer immediately was made after the third and final meeting of the ad hoc committee, and was communicated by Zinner (chair of the

_____

[16] Bulwer's claim in this regard requires that we disregard the undisputed facts concerning the multiple communications to Bulwer concerning his right to appeal the ad hoc committee's decision.

department of medicine) to Flint. Bulwer's requests for materials considered during the second and third meetings of the ad hoc committee went unanswered. Fourth, as discussed in the previous section, there was evidence that Bulwer was not given the same remediation opportunities as his peers and that the weekly meetings with his supervisor that were part of his remediation plan did not occur. We are unpersuaded by the hospital's argument that, even if the jury were to accept that the hospital breached its obligations, those breaches were immaterial as a matter of law. The ad hoc committee's decision rested in large part on information considered and aired during the two meetings from which Bulwer was excluded, and the decision to terminate him appears to have stemmed from a process that did not afford any of the procedural protections of the hospital's policies or the ACGME guidelines.

c. <u>Defamation</u>. Bulwer's defamation claim is based on the two mass e-mails sent to hospital personnel after his termination. He contends that the false implication of the e-mails was that his incompetence as a physician was such that he should not be engaged in a medical career. Even were we to accept this as a reasonable reading of the e-mails, and that the statements were false (neither view we hereby endorse), summary judgment properly entered on the claim.

An employer has the conditional privilege to "disclose defamatory information concerning an employee when the publication is reasonably necessary to serve the employer's legitimate interest in the fitness of an employee to perform his or her job."  White v. Blue Cross & Blue Shield of Mass., Inc., 442 Mass. 64, 69 (2004), quoting from Bratt v. International Bus. Machs. Corp., 392 Mass. 508, 509, (1984).  Here, there is no suggestion in the summary judgment record that the e-mails were sent for any reason other than to notify physicians and staff at the hospital of Bulwer's departure.  The first e-mail was sent on the day of his termination and included instructions that Bulwer was not permitted to see or treat patients.  The second e-mail was sent the very next day to Bulwer's fellow residents in the residency program.

It is true that an employer may lose its privilege if it "(1) knew the information was false, (2) had no reason to believe it to be true, . . . (3) recklessly published the information unnecessarily, unreasonably, or excessively," or (4) that it acted out of malice.  Dragonas v. School Comm. of Melrose, 64 Mass. App. Ct. 429, 438 (2005), quoting from Sklar v. Beth Israel Deaconess Med. Center, 59 Mass. App. Ct. 550, 558 (2003).  However, Bulwer did not meet his burden of putting forward a record on summary judgment that would permit a rational fact finder to conclude that the hospital was not

entitled to the conditional privilege with respect to the two e-mails.  See Foley v. Polaroid Corp., 400 Mass. 82, 95 (1987) (employee bears burden of demonstrating that employer has lost privilege).

d.  Retaliation.  General Laws c. 151B, § 4(4), "makes it unlawful for 'any person . . . to discharge, expel or otherwise discriminate against any person because he has . . . filed a complaint'" alleging discrimination.  Psy-Ed Corp. v. Klein, 459 Mass. 697, 706 (2011), quoting from G. L. c. 151B, § 4(4).  A prima facie case of retaliation requires the plaintiff to show (1) his engagement in protected conduct; (2) the infliction of some adverse action; and (3) a causal connection between the two.  Mole v. University of Mass., 442 Mass. 582, 591-592 (2004).

Bulwer alleges that the hospital unlawfully retaliated against him by (1) terminating him because on two occasions he responded to Flint in writing about certain criticisms of his performance, and (2) not providing him with a process to appeal from the ad hoc committee's decision after he had filed his complaint with the Massachusetts Commission Against Discrimination (MCAD) on August 25, 2006.

Both claims fail.  Bulwer's communications related solely to his disagreement with the criticisms that had been leveled against his work -- they cannot be reasonably read to raise a

complaint about discrimination and, accordingly, they are not protected activity within the meaning of G. L. c. 151B, § 4(4). The record shows that the hospital offered Bulwer a discretionary appeal from the ad hoc committee decision, and that Bulwer never pursued the offer of appeal. Moreover, the fact that Bulwer's MCAD complaint was filed more than two months after the hospital offered him an appeal defeats his ability to demonstrate any causal connection between the protected activity and the supposed retaliation. See Mole v. University of Mass., 442 Mass. at 592 (inferable causal connection will arise from adverse employer action "in the immediate aftermath" of employer's awareness of protected activity).

e. Tortious interference. To prove that Flint, Wellisch, and Balestrero intentionally interfered with his contractual relationship with the hospital, Bulwer must prove that they acted "malevolently, i.e., for a spiteful malignant purpose unrelated to the legitimate corporate interest." Ayash v. Dana Farber Cancer Inst., 443 Mass. 367, 395 (2005), quoting from Wright v. Shriners Hosp. for Crippled Children, 412 Mass. 469, 476 (1992). Although, as set out above, we conclude that the record is sufficient to put the claim of discrimination to a jury, that record does not suffice to raise a genuine issue of fact regarding malevolence on the part of the three individual defendants.

3.  <u>Conclusion</u>.  For the reasons stated above, we reverse that portion of the judgment dismissing the claims of discrimination in violation of G. L. c. 151B and for breach of contract.  The judgment is otherwise affirmed.

<u>So ordered</u>.

SIKORA, J. (concurring in part and dissenting in part, with whom Meade, J., joins).  I concur in the affirmance of summary judgment entered by the Superior Court judge on Dr. Bernard Bulwer's claims of (1) retaliation against his complaint of discrimination, as prohibited by G. L. c. 151B, § 4, by Mount Auburn Hospital (MAH); (2) defamation by MAH; and (3) tortious interference with his residency contract by the three individual physician defendants.  I dissent from the reversal of summary judgment entered by the judge against Bulwer's remaining claims of (1) discrimination based on his race and national origin within the meaning of G. L. c. 151B, § 4, by MAH; and (2) breach of his residency contract by MAH.

The rationale offered by the majority in support of its discrimination analysis constitutes an extraordinary aberration from basic principles of evidence.  It violates settled standards of summary judgment practice and draws appellate judges into the act of second guessing professional medical judgments.  A gaping deficiency extends through the core of its position:  the absence of any admissible evidence, and indeed of any trustworthy information, creating a genuine material factual issue of racial animus or of a pretext veiling racial animus on the part of MAH and its physicians; and the presence of abundant admissible evidence of unsatisfactory medical performance by Bulwer.

The majority's treatment of the breach of contract claim relies in part upon the premise of MAH's possible engagement in racial discrimination and fails in part with that claim. The remaining bases of the majority's contract reasoning rest upon an erroneous interpretation of the contract and fail as a matter of law. I would affirm in full the thorough analysis of all claims by the Superior Court judge in her lengthy memorandum of decision and her entry of summary judgment on all counts.

Background. A full and accurate account of the relevant summary judgment record of this unfortunate case requires substantial enlargement of the majority's portrayal.

1. Biography. Bulwer achieved his medical degree in 1989 from the University of the West Indies. From that date into 2002, he practiced in Trinidad (1989-1991), Belize (1991 to 1993), the United Kingdom (1994-1996), and again in Belize (1997-2002). He received a master of science degree in nutrition in 1994 in the United Kingdom. His practice during those years centered in subjects of nutrition and diabetes. His curriculum vitae lists authorships of seven journal articles, ten book chapters, and either authorship or editorship of seven books.

Bulwer came to the United States in 2002. His first experience in the American medical system was participation as a research associate and fellow in a subresidency cardiology

program at Brigham and Women's Hospital in Boston from 2002 to 2005. In the course of that work he brought a charge of discrimination against a supervisor. An ombudsman resolved that dispute by terms omitted from our record.

In April, 2005, Bulwer wrote to Dr. Eric Flint, the director of MAH's internal medicine residency program, and inquired about a position. Flint interviewed Bulwer and thought him personable, capable, and well trained. Bulwer did not inform Flint of his discrimination claim at Brigham and Women's Hospital. In June of 2005, MAH offered Bulwer a residency position in internal medicine. He would begin his residency in September of 2005, two months after the normal commencement in July. He signed a one-year medical resident agreement (MRA). With the approval of MAH, it was renewable on an annual basis for two additional years.

2. Bulwer's rotations. In September of 2005, Bulwer began his monthly rotations at MAH. Various supervising physicians evaluated residents' performances within the rotations. In addition, the clinical competence committee (CCC), comprised of thirteen physicians and advisers, met periodically to assess residents' progress. The CCC determined whether MAH should retain and advance residents on the basis of satisfactory completion of educational and training objectives.

MAH's residency program complied with standards set by the National Accreditation Counsel for Graduate Medical Education (ACGME). The ACGME mandated a member hospital to require demonstrated competence in (1) patient care, (2) medical knowledge, (3) practice-based learning, (4) interpersonal and communication skills with patients, families, and other health professionals, (5) professionalism, and (6) systems-based (high technology) practice. MAH supervisory physicians graded residents in each of these six core competencies at the conclusion of each monthly rotation.[1]

Bulwer's opening assignment in September, 2005, to the emergency medicine department went well. His supervisors viewed his work favorably, with one exception.[2]

However, Bulwer's October rotation in the medical intensive care unit (MICU) resulted in evaluations of unsatisfactory performance from all three of his supervisors. One gave him failing ("needs improvement") grades in all six core competencies; another in five; and a third in three. Critical

---

[1] The grading scale extended from numerals 1 (lowest rating) through 5 (highest). Grades 1 and 2 signified a need for improvement; 3 was "satisfactory"; and 4 and 5 reflected "superior" performance.

[2] One evaluator gave him an "overall" rating of "below average." As a narrative summary, the evaluator commented, "Very good knowledge of cardiac issues. Major deficiencies in other areas of medicine. Not ready to be a PGY II [second year resident]."

commentary accompanied the grades. One supervisor wrote, among other concerns, "Made drastic and potentially dangerous/life threatening decisions about [patient] care [without] consulting attending. Was not always honest about [patient] care and his role as the intern (i.e. labs ordered, medications ordered). Needs to improve [history] & [physical] writing skills, especially assessment and plan. . . . Too confident for his own good and [patient's] own good without showing any proof of capability to perform at the level of an intern or resident yet." A second evaluator commented that Bulwer was "optimistic" and "eager to learn" but that "[h]e does not seem to be aware of his responsibilities as an intern despite being told them repeatedly." A third wrote that, as goals for improvement, Bulwer needed to increase his fund of knowledge, to improve the depth of his histories and physicals, and to "take feedback as constructive criticism and improve [his] attitude." In late October, that evaluator (Dr. Carey Thomson, a senior attending physician in the MICU) met with Bulwer to discuss those concerns further.

The October evaluations identified weaknesses in three of the residency program's six prescribed areas of core competency: (1) Bulwer's grasp of complex cases; (2) professionalism and interpersonal communications; and (3) practice-based learning, i.e., the capacity to accept and to learn from evaluation and

criticism.  Bulwer disagreed with the October evaluations, and sent written objections to his supervisors and to Flint.

In mid-November, Dr. Lori Balestrero, his adviser, met with Bulwer to discuss the evaluations.  A memorandum resulting from the meeting and signed by Bulwer acknowledged that he "understands [that] continuation in the program is contingent on his improved performance."  On December 1, the CCC and Balestrero forwarded to Bulwer a memorandum proposing a six-point remedial plan for improvement during the month of December.[3]

Meanwhile in November and December, Bulwer performed a "wards" rotation comprised of evaluation and care of patients admitted to MAH.  Three evaluations from that rotation appear in the summary judgment record.  One supervisor graded Bulwer positively, urged him to communicate more concisely, but credited him with "much improvement."  A second evaluator (who did not give specific grades) wrote to Bulwer, Balestrero, and Flint that Bulwer's history, physical, and progress notes were "[o]verall . . . pretty good" but could benefit from greater conciseness or specificity.  The third supervisor awarded an over-all passing grade, but found him deficient in practice-

---

[3] The plan included weekly meetings between Bulwer and Balestrero.  The majority notes that "[t]hose meetings did not occur."  Ante at    .  Balestrero's deposition testimony is that she tried unsuccessfully to schedule time with Bulwer.

based learning and improvement (failure to accept feedback and undertake improvement), professionalism (failure to accept responsibility for actions and decisions), and -- most particularly -- the organization of notes of patients' physical examinations and progress.

Bulwer's January, 2006, rotation occurred in the cardiology department and generated three evaluations. One supervising physician gave Bulwer high marks in all competencies without narrative comment. A second gave him passing grades and favorable comments, and a recommendation for deeper patient presentations. However a third supervisor gave him predominantly failing grades in five of the six competencies, with no additional commentary.

In February, Bulwer returned to a wards rotation. Two supervisors evaluated him. One gave him over-all passing grades with two reservations: his questionable ability to "synthesize[] key information in the history, physical (exam) and data to develop an accurate, problem-based assessment and plan," including the development of an expanded differential diagnosis; and his uncertain capacity for practice-based learning and improvement, or more specifically his acceptance of feedback for self-assessment and improvement.

The other February wards evaluation was severely critical. Dr. Erica Bial had supervised Bulwer throughout the month. She

gave him failing grades in all six competencies: the minimum grade of 1 in four of them and the grade of 2 in the other two. Her extended commentary was emphatic: "My experience of Dr. Bernard Bulwer during our month together on the wards was horrendous. I feel that Bernard is a poor intern, and that he suffers major deficiencies, many of which I am gravely concerned are impossible to remediate. There is no aspect of the central competencies in which Bernard is evenly modestly competent, and in truth I cannot envision his possessing the ability to ever function as a resident in this program. My concerns can be summarized into four major areas: Clinical Knowledge, Communication Skills, Patient Care, and Professionalism." She elaborated upon those failings with rigorous specificity and examples.

As to clinical knowledge, Bial found that Bulwer showed a specialized interest in echocardiology but that he failed to seek and integrate new clinical knowledge into his daily practice upon the general patient population in the wards. He seemed "intellectually disorganized, confused, and just plain ill-informed about physiologic processes, algorithmic evaluation, and options for treatment of most diseases." These shortcomings required her oversight "even on the moment-to-moment management of 'simple' patients."

As to communication skills, Bial found Bulwer unwilling to ask for help in cases beyond his experience, unable to keep her informed of changes in patients' plans and of emergency clinical concerns, and "belligerent" in response to evaluation. She viewed his presentations on rounds to be incomplete and disorganized. He did not adequately communicate treatment plans to patients and families and treated coworkers, instructors, and nurses disrespectfully. He would not honestly acknowledge to her his failure to communicate with consultants, to write orders, and to keep up with his daily clinical tasks.

In her assessment of patient care, Bial credited Bulwer with genuine concern with the well-being of patients but found him unable to function efficiently in the hospital environment. In particular, his average time to complete an initial history, physical, and admission note approximated three hours. He did not stay informed of the results of laboratory and diagnostic tests and of new patient data. His histories and physical notes were unclear and meandering. He did not readily establish rapport, trust, and respect with patients and families.

As to professionalism, Bial concluded that Bulwer "refuses to accept constructive criticism," "has no capacity whatsoever for self-assessment," treated her with hostility, and resented direction from women in a professional environment. His age and experience caused him to describe his first-year residency

status as a "grave indignity" and "beneath him."  She viewed those traits as irremediable.  "While he certainly talks the talk of someone eager to learn and participate, his actions demonstrate an individual who fails to communicate or function even minimally effectively as a member of the medical team." Bial offered to meet with the program director for further discussion.

The majority does not set out the sequence of Bulwer's six rotations in clear order.  In particular, it blurs the timing of the February, 2006, evaluations.  The chronology is important. It indicates a failure of improvement and the resistance to remediation by Bulwer during the four months between the October and February evaluations.  No positive trend had taken hold despite the involvement of his adviser (Balestrero) and the CCC during November and December.  His professional shortcomings remained persistent and thematic.

The thirteen-member CCC considered the evaluations.  On April 5, 2006, it notified Bulwer that it had confirmed "areas of concern" precluding his promotion to the second year.  Its letter to Bulwer identified problems with (1) "analyz[ing] clinical data in complex cases"; (2) "interpersonal and communication skills"; and (3) "gain[ing] insight into feedback."  The signatories were Flint, residency program director, and Riccardo Wellisch, chair of the CCC.

3. <u>MAH's due process proceedings</u>. As a result of the CCC's decision of nonrenewal, MAH in accordance with its written policy[4] convened an ad hoc appeal committee (AHC) to review the CCC's conclusion. The AHC consisted of four physicians: the chairs of the departments of medicine and radiology; the director of the training program for radiology; and, in this instance, the director of medical education, Dr. Charles Hatem, who served as chair of the AHC. The AHC process sought to assure sanctioned residents a fair hearing, including the right to attend and the opportunity to present evidence and argument.

The AHC met three times. Bulwer attended the first meeting, on April 24, 2006. Flint submitted the evaluators' concerns about Bulwer's deficiencies in the three core competencies and offered examples of errors in patient care from three charts. Bulwer disputed the deficiencies alleged by the evaluators and Flint. He did not express any feelings of discrimination. Three days after the meeting, he submitted a fourteen-page letter responding specifically to alleged patient care errors and the core competency concerns. The letter contained no complaint of discriminatory treatment.

---

[4] The hospital codified its procedure for residency sanctions in a formal document entitled "Houseofficer Evaluation/Grievance/ Due Process Policy," approved by its medical education committee (due process policy).

At the conclusion of the first meeting, the AHC began deliberations and decided that it "need[ed] more data" and communications with other physicians to make sure that it had exercised "due diligence and due process." Chairman Hatem was especially concerned that, as a means of thoroughness and fairness, the AHC receive information from rotation supervisors directly familiar with Bulwer's performance.

At a second meeting on May 1, 2006, the AHC interviewed Balestrero, two senior evaluators from the MICU (Thompson and Dr. Robert Westlake), Dr. Gary Setnik, chair of the department of emergency medicine, and Wellisch. Balestrero, Westlake, Thomson, and Wellisch regarded Bulwer as still deficient in the competencies specified by the CCC. Thomson, Westlake, and Wellisch viewed Bulwer as "dangerous" to patient safety. Setnik judged him to be "better than average" and free of any "specific shortcoming need[ing] drastic attention."

The AHC devoted its third meeting on May 9, 2006, exclusively to deliberation. It reviewed all submitted materials, weighed the satisfactory emergency department and cardiology rotations against the criticized work in the intensive care units and on wards, and ultimately concluded that Bulwer's performance of the residency had been substandard. The four AHC members voted unanimously to support the CCC decision of nonrenewal of his MRA after the first year.

On May 17, 2006, Flint and Dr. Stephen Zinner, the chair of the department of medicine, met with Bulwer. They informed him that MAH would not offer him further training. By separate letters of that date, Flint and Zinner formally reported the AHC decision to Bulwer. On the same day, Zinner wrote a "memo to file," summarizing the decision and its grounds, including concern for patient safety. The memorandum included the following passage:

> "I also informed Dr. Bulwer that in the three week period during which the appeal was reviewed, I had received several communications from attending physicians that pointed out that Dr. Bulwer had demonstrated additional clinical errors, failures to document or comply with our clearly stated expectations about chart notes, and failures to call for appropriate help with severely ill patients. In addition I told him I recently was made aware of a review by the Department of Quality and Safety at Mount Auburn Hospital of a patient under his care last January whose death might be attributable to an error made by Dr. Bulwer."

The memorandum stated that Flint had decided to terminate Bulwer immediately rather than to permit him to finish the remaining months of his MRA; it stated also that Zinner supported that decision.[5]

---

[5] In accordance with MAH's due process policy, only the chair of the department of medicine, Zinner, could terminate a resident for concerns of patient safety.

Bulwer immediately appealed from the AHC's decision to the president and chief executive officer of MAH, Jeanette Clough.[6] On June 5, 2006, Clough forwarded a letter of notice to Bulwer that she would convene a committee to review the AHC's decision. Despite three attempted deliveries by the post office, Bulwer did not claim the letter.[7] In June, in accordance with the hospital's statutory obligation,[8] Flint advised the Board of Registration in Medicine that MAH had terminated Bulwer from the residency program. In July of 2006, Bulwer received Clough's letter, but pursued no further process at MAH.

Analysis. 1. Discrimination. a. Absence of disparate impact claim. Neither in the Superior Court nor on appeal has Bulwer presented or argued a claim of discrimination by reason of disparate impact. As the majority acknowledges, the summary judgment record shows that over the six years from 2000 through 2006, approximately 252 residents matriculated at MAH; that three of them failed to complete the program; and that two of

---

[6] MAH's due process policy required Bulwer to appeal from the AHC's decision to the president of the medical staff, who was not Clough.

[7] Bulwer testified in his deposition that he could not receive the letter because he was hospitalized for temporary blindness, a condition which he alleged the defendants' conduct to have triggered.

[8] General Laws c. 112, §§ 5B and 5F, require a hospital to report a termination of a registrant's privileges for cause to the Board of Registration in Medicine.

the three were of African descent and one Caucasian.  From these numbers the majority submits, "It is for the jury to decide whether the fact that two-thirds of the terminated residents are of African descent is a pattern from which discriminatory animus can be inferred in the termination of Bulwer."[9]  Ante at     .

No authority supports this remarkable proposition. "Discrimination that is based on proof of disparate impact 'involve[s] employment practices that are facially neutral in their treatment of different groups, but that in fact fall more harshly on one group than another.'"  Lopez v. Commonwealth, 463 Mass. 696, 709 (2012), quoting from School Comm. of Braintree v. Massachusetts Commn. Against Discrimination, 377 Mass. 424, 429 (1979).  See Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 987-988 (1988).  Here Bulwer has not identified a suspect employment practice by MAH.  Nor has he proposed that three terminations out of the 252 residencies provide a statistical

---

[9] By footnote, the majority continues:  "This is not statistical evidence. . . .  It is nonetheless evidence of the racial composition of the residents who have historically been terminated from the hospital's residency program.  On summary judgment, we are not entitled to disregard it.  If the case proceeds to trial -- as it should -- the hospital will have an opportunity to rebut the inference that can be drawn from this evidence by introducing additional information concerning the composition of the program and those who have been terminated from it."  Ante at note 13.  This reasoning reduces to the notion that, although Bulwer is not pursuing a disparate impact claim, he should receive the benefit of inadequate evidence of such a claim.

sample sufficient to qualify as evidence in support of any inference.  See Fudge v. Providence Fire Dept., 766 F.2d 650, 657-659 (1st Cir. 1985) (African-American plaintiff failed to prove disparate impact claim under Title VII where written examination for hiring in fire department resulted in admission of four percent of black applicants as compared to thirteen percent of white applicants because [1] sample size constituted "narrow data base" [only twenty-four of 248 applicants were black], [2] results lacked statistical significance, and [3] results could have occurred by chance).  See also 2 Larson, Employment Discrimination § 22.05 (2d ed. 2014) (requiring adequate sample size to permit inference of statistical significance and disparity).  The majority's reference to the minute incidence of residency failure cannot manufacture a triable issue of disparate impact or disparate treatment.

2.  Standard of review.  We study de novo the same record as the motion judge.  See Matthews v. Ocean Spray Cranberries, Inc., 426 Mass. 122, 123 n.1 (1997); Chai-Sang Poon v. Massachusetts Inst. of Technology, 74 Mass. App. Ct. 185, 194 (2009).  The majority invokes the guidance that questions of intent or motivation are usually unsuitable for disposition of summary judgment.  However the applicable standard of review has moved far beyond that generality.  Otherwise a conclusory assertion of intent or motive will immunize itself from

inspection and force the conduct of an unwarranted trial.  The developed refinements of the standard of review call for examination of the summary judgment record in the light most favorable to the nonmoving or opposing party (Bulwer) and ask whether the record resolves the material questions of fact and issues of law in favor of the moving parties.  The "most favorable" light is comprehensive; it falls upon evidence submitted by <u>both</u> a complaining employee and a responding employer.  See <u>Sullivan</u> v. <u>Liberty Mut. Ins. Co.</u>, 444 Mass. 34, 37 (2005) (weighing possible deficits in employee's "responsiveness to clients," "collegiality," and "human relations skills"); <u>Chai-Sang Poon</u> v. <u>Massachusetts Inst. of Technology</u>, <u>supra</u> at 196-199 (assessing history of friction with students, staff, and colleagues).[10]

In cases of alleged employment discrimination, intent, motivation, and credibility will typically come into dispute. Massachusetts precedents have consistently concluded that a defendant employer is entitled to summary judgment against an accusation of discrimination if the employer demonstrates that the employee's "evidence of intent, motive, or state of mind is

---

[10] In particular, the majority avoids the obligation to consider countervailing evidence, <u>ante</u> at    (addressing "summary judgment record"), and consequently offers a one-sided synopsis of the record without explanation of the performance of Bulwer as concededly "short of expectations."  <u>Ante</u> at    .

insufficient to support a judgment in the plaintiff's favor." Blare v. Husky Injection Molding Sys. Boston, Inc., 419 Mass. 437, 440 (1995).  See, e.g., Matthews v. Ocean Spray Cranberries, Inc., 426 Mass. at 127; Sullivan v. Liberty Mut. Ins. Co., 444 Mass. at 39-40 (affirming summary judgment against allegation of discriminatory motive); Tardanico v. Aetna Life & Cas. Co., 41 Mass. App. Ct. 443, 447-450 (1996) (same); Romero v. UHS of Westwood Pembroke, Inc., 72 Mass. App. Ct. 539, 545-548 (2008) (same); Chai-Sang Poon v. Massachusetts Inst. of Technology, 74 Mass. App. Ct. at 196-199 (same).

c.  Discriminatory treatment claim.  i.  Summary judgment standards.  Under G. L. c. 151B, § 4(1), to establish liability for racially motivated employment discrimination, Bulwer must prove each of four prima facie elements:  "membership in a protected class, harm, discriminatory animus, and causation." Lipchitz v. Raytheon Co., 434 Mass. 493, 502 (2001).  Sullivan v. Liberty Mut. Ins. Co., 444 Mass. at 39.  If the evidence shows the plaintiff to have "no reasonable expectation" of proof of a prima facie element, the defendant is entitled to summary judgment.  Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).

In the typical setting of only circumstantial information, the case at trial would proceed through the three burden-shifting stages established by McDonnell Douglas Corp. v. Green,

411 U.S. 792, 802 (1973), and Wheelock College v. Massachusetts Commn. Against Discrimination, 371 Mass. 130, 138-139 (1976). Bulwer must offer prima facie evidence of discrimination, a light burden which we shall assume to have been carried. See Sullivan v. Liberty Mut. Ins. Co., 444 Mass. at 40. Then MAH must offer a legitimate nondiscriminatory ground for its action and produce credible supporting evidence, as accomplished here by the account of unsatisfactory performance. See Abramian v. President & Fellows of Harvard College, 432 Mass. 107, 117 (2000), and cases cited. Third, and often decisively for the purpose of summary judgment, the burden returns to Bulwer to prove that MAH's reason for termination constituted a pretext concealing a discriminatory purpose. See, e.g., Matthews v. Ocean Spray Cranberries, Inc., 426 Mass. at 128.

The majority incorrectly states that at the stage of summary judgment "the issue is whether the hospital met its burden of establishing that there is no genuine issue of fact concerning pretext" (emphasis supplied). Ante at   . Where, as here, the first two stages of the burden-shifting framework are not in dispute, the question on summary judgment reduces to whether "the plaintiff introduced sufficient material to demonstrate that there is a genuine issue of material fact whether the defendant's proffered reason is a pretext; that is, '[d]oes the employer's articulated reason lack[] reasonable

support in evidence or is [it] wholly disbelievable[?]'"
(emphasis supplied).  Brooks v. Peabody & Arnold, LLP, 71 Mass.
App. Ct. 46, 52 (2008), quoting from Lewis v. Area II Homecare
for Senior Citizens, Inc., 397 Mass. 761, 765 (1986) (affirming
summary judgment for defendant).  Accord, Brunner v. Stone
Webster Engr. Corp., 413 Mass. 698, 699-700, 703-705 (1992)
(affirming summary judgment for defendant); Tardanico v. Aetna
Life & Cas. Co., 41 Mass. App. Ct. at 448 (affirming summary
judgment for defendant); Chai-Sang Poon v. Massachusetts Inst.
of Technology, 74 Mass. App. Ct. at 196-197 (affirming summary
judgment for defendant).  In the summary judgment process, the
defendant does not acquire an additional burden of disproving
pretext (i.e., proving a negative); rather, the plaintiff must
substantiate a genuine issue of its presence.  See Wheelock
College v. Massachusetts Commn. Against Discrimination, 371
Mass. at 138-139.  The plaintiff may not rest "merely upon
conclusory allegations, improbable inferences, and unsupported
speculation."  Brooks v. Peabody & Arnold, LLP, supra at 56,
quoting from Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d
5, 8 (1st Cir. 1990).  Indeed, "if the evidence is in balance,
the employer must prevail."  Trustees of Forbes Library v. Labor
Relations Commn., 384 Mass. 559, 566 (1981).  See Sullivan v.
Liberty Mut. Ins. Co., 444 Mass. at 57 (affirming summary
judgment for defendant employer because "ample, uncontroverted

evidence [showed] that the negative impression [which the employer] had formed of [the employee's] abilities was a primary reason [why the employee] was selected for layoff").

Finally, it bears emphasis in this instance that the information submitted in support of, and opposition to, summary judgment must have the quality of "facts as would be admissible in evidence" at trial. Mass.R.Civ.P. 56(e), 365 Mass. 824 (1974). As we will specify, the information offered by Bulwer in support of pretextual conduct by MAH falls well below the threshold of admissible evidence.

ii. <u>Proffered information</u>. The majority relies upon four categories of information as evidence of pretext: (i) MAH's treatment of other residents or physicians; (ii) the words or conduct of supervisors during Bulwer's rotations or due process review; (iii) the representations of Dr. Romana Dvorak; and (iv) the allegedly "shifting explanations" provided by MAH to the Board of Registration in Medicine for termination of Bulwer's residency. None withstands analysis.

(A) <u>Treatment of comparable individuals</u>. "The most probative means of establishing that the plaintiff's termination was a pretext for racial discrimination is to demonstrate that similarly situated white employees were treated differently." <u>Matthews</u> v. <u>Ocean Spray Cranberries, Inc</u>., 426 Mass. at 129,

citing <u>Smith College</u> v. <u>Massachusetts Commn. Against</u>
<u>Discrimination</u>, 376 Mass. 221, 228 (1978).

The majority contends that "Bulwer was not given the same
remediation opportunities as other first year residents who
struggled in the program," <u>ante</u> at    ; that two of the three
members terminated from the residency program since 2000 were
"of African descent," <u>ante</u> at    ; and that another "intern of
African descent did not continue in the program," <u>ante</u> at    .
However, the majority does not acknowledge that the record tells
us nothing about those terminated residents:  neither their
identities, nor their qualifications and performances, nor the
reasons for their departures, nor their remedial opportunities.[11]

In <u>Matthews</u> v. <u>Ocean Spray Cranberries, Inc</u>., 426 Mass. at
130, quoting from <u>Smith</u> v. <u>Stratus Computer, Inc</u>., 40 F.3d 11,
17 (1st Cir. 1994), cert. denied, 514 U.S. 1108 (1995), the
court explained that, to establish pretext by demonstrating
differential treatment of similarly situated persons, a
plaintiff must identify comparators "in terms of performance,
qualifications and conduct, 'without such differentiating or
mitigating circumstances that would distinguish' their

---

[11] The other residents experiencing difficulty, but
maintained in the program in recent years, were two
international medical graduates who "struggled" with MAH's
computer system (and one with a language barrier).  MAH
permitted them to repeat rotations.

situations."  The court has since held that the comparators'
circumstances must be "substantially similar to those of the
complainant 'in all relevant aspects' concerning the adverse
employment decision."  Trustees of Health & Hosps. of Boston,
Inc. v. Massachusetts Commn. Against Discrimination, 449 Mass.
675, 682 (2007), quoting from Matthews v. Ocean Spray
Cranberries, Inc., supra at 129.  "The test is whether a prudent
person, looking objectively at the incidents, would think them
roughly equivalent and the protagonists similarly
situated. . . .  Exact correlation is neither likely nor
necessary, but the cases must be fair congeners.  In other
words, apples should be compared to apples."  Ibid., quoting
from Dartmouth Review v. Dartmouth College, 889 F.2d 13, 19 (1st
Cir. 1989).  A "plaintiff does not carry his burden of
demonstrating pretext on a motion for summary judgment where he
provides merely 'sketchy evidence lacking a sufficient
foundation for a legally relevant comparison' of allegedly
similarly situated employees."  Matthews v. Ocean Spray
Cranberries, Inc., supra at 131 n.6, quoting from Smith v.
Stratus Computer, Inc., 40 F.3d at 17.[12]

---

[12] The majority states that "[i]t is for the jury to decide
whether the fact that two-thirds of the terminated residents are
of African descent is a pattern from which discriminatory animus
can be inferred in the termination of Bulwer."  Ante at    .  In
an accompanying footnote, the majority also faults MAH for not

(B) <u>Conduct and words of supervisory physicians</u>.  The majority proposes that the conduct or words of multiple MAH physicians permit a reasonable inference of unfair treatment and therefore pretext masking racial animus.  In the view of the majority, these deeds and words included (1) criticism of emergency department physicians by MICU physicians as a result

---

"introducing additional evidence concerning the composition of the program and those who have been terminated from it."  <u>Ante</u> at note 13.  We disagree on both points.

First, as discussed previously, the relevant legal question is whether Bulwer has introduced sufficient evidence to demonstrate a genuine issue of material fact as to pretext.  MAH has no third-stage summary judgment obligation to introduce evidence to prove the absence of pretext.

Second, even if three cases out of 252 could somehow create a "pattern," the evidence of the dismissed residents is relatively meaningless because we know nothing about the reasons for their dismissals.  See <u>Matthews</u> v. <u>Ocean Spray Cranberries, Inc</u>., 426 Mass. at 130 n.4 ("The plaintiff also asserts that the defendant has exhibited discriminatory intent in that it does not employ African-American managers or supervisors.  However, he has not supported this assertion, as he must in order to meet the burden of establishing pretext, with evidence concerning whether any African-Americans ever applied for such positions, and, if so, evidence concerning their qualifications.  Thus, the plaintiff's assertions do not assist his pretext claim"); <u>Sullivan</u> v. <u>Liberty Mut. Ins. Co</u>., 444 Mass. at 54-56 & n.36 (statistical evidence had "limited probative value" in proving pretext because it failed "to eliminate other explanations for the disproportionate statistics, such as random chance [given the small discrepancies and sample size involved here] or the actual distribution of aptitudes or expertise among [employees] . . . both before and after the [employment decision]"); <u>Boston</u> v. <u>Massachusetts Commn. Against Discrimination</u>, 39 Mass. App. Ct., 234, 243 (1995) (evidence of discharged employees is "not very instructive" without knowledge of "the reasons underlying those discharges").

of the emergency department's favorable evaluation of Bulwer, ante at    ; (2) the failure of Flint to "follow up" with physicians engaged in unfair criticism of Bulwer, ante at    ; (3) the failure of Balestrero to hold weekly meetings with Bulwer after December 1, 2005, ante at    ; (4) open criticism of Bulwer by Bial, ante at    ; (5) an impliedly critical comment by CCC chair Wellisch, ante at    ; (6) the imposition of termination rather than nonrenewal, ante at    ; and (7) alleged irregularities in the AHC process, ante at    .

The most obvious characteristic of this body of behavior is its professional, not racial, nature.  The majority's insinuation of racial, rather than medical, motivation constitutes guesswork rather than reasonable inference.  None of these events indicates that the actors dealt with race or made less than a good faith judgment about Bulwer's professional performance.  See Brunner v. Stone & Webster Engr. Corp., 413 Mass. at 703-704, and cases cited (lack of evidence contradicting good faith evaluation of employee's performance permits summary judgment for employer).  Indeed the record reflects the efforts of individual physicians to assist Bulwer's residency.  Flint accommodated Bulwer's late entry into the

program.[13]  Balestrero testified that she both met and attempted to meet with Bulwer.  Bial acknowledged that she confronted him on multiple occasions to address the quality of his work.  The one such instance cited by the majority occurred in a small room outside the presence of patients and in the presence of one other resident.  No evidence supports the imputation that she "harbored" a separate personal racial animosity toward him.  Wellisch's comment that a resident's duty is to furnish information to senior physicians related to medicine and not

---

[13] In deposition testimony, Bulwer effectively acknowledged his unawareness of any evidence of animus from Flint.

> Q.:  "When he accepted you into the program out of the normal rotation, you didn't believe at that time that he was discriminatory --"
>
> A.:  "Loved -- loved him to bits."
>
> Q.:  "Okay. At this point in time in April[,] 2006[,] did you believe he was discriminatory against you?"
>
> A.:  "By virtue of him siding with people who were supremacist [with] their language and said and did what they did, then I had to lump them all in one basket."
>
> Q.:  "So you believe Dr. Flint acted with a discriminatory animus towards you?"
>
> A.:  "Yes."

To this concession, one could add the improbability that Flint's professional receptiveness would transform into discriminatory rejection in the course of eight months.  See Dziamba v. Warner & Stackpole LLP, 56 Mass. App. Ct. 397, 406 (2002), and cases cited ("[I]t is improbable that the same persons who hire or promote someone already in a [protected group] will suddenly develop an aversion to [that group]").

race. MAH's written due process policy specifically authorized termination of a residency, rather than mere nonrenewal by the AHC, "in cases where patient safety and well-being may be in jeopardy as determined by the Chair of the Department [of Medicine]." Here, that chair, Zinner, served as a member of the AHC and made such a determination.

The majority's imputation of pretext or animus to these multiple, separate professional judgments is unsupported and unsupportable. See Wooster v. Abdow Corp., 46 Mass. App. Ct. 665, 672 (1999) (affirming summary judgment for defendant on age discrimination claim where "there [were] no remarks concerning age and no apparent connection between the evaluations and the plaintiff's age"); Bruce v. Wellesley, 47 Mass. App. Ct. 800, 806 (1999) (remanding case to Superior Court for entry of judgment notwithstanding verdict because "[o]ther than the undisputed fact that the plaintiff was over age forty at the time he was discharged, there was no showing that the town was concerned about the plaintiff's age" when it denied him tenure as teacher at high school).

The case law requires invidious motive, not perfect evaluation, by the employer. Sullivan v. Liberty Mut. Ins. Co., 444 Mass. at 56. "The employer's reasons [for adverse action] need not be wise, so long as they are not discriminatory and they are not pretext." Tardanico v. Aetna Life & Cas. Co., 41

Mass. App. Ct. at 448. "[N]ot every unfair termination . . . constitutes unlawful employment discrimination . . . . Membership in a protected class without more is insufficient to make the difference." Weber v. Community Teamwork, Inc., 434 Mass. 761, 778 (2001). See Wooster v. Abdow Corp., 46 Mass. App. Ct. at 673 (same). In this case, Bulwer has offered only membership in a protected group, and nothing more.[14]

(C) Dr. Ramona Dvorak. Dvorak furnished deposition testimony in support of Bulwer. She had worked at MAH from 1997 until 2005. During her last six years she had served as the director of consultation psychiatry, until MAH eliminated that position. She observed Bulwer on approximately twenty occasions, and viewed him as a "talented and outstanding clinician." Dvorak had submitted a letter to the AHC in support of him. She could not recall any specific interactions with him.

---

[14] The majority points out that Bulwer received some favorable rotation evaluations. Ante at    . However the favorable reviews do not permit a reasonable inference that MAH's reliance on the unfavorable assessments was false. See Lipchitz v. Raytheon Co., 434 Mass. at 502, 507; Knight v. Avon Prod., Inc., 438 Mass. 413, 421-422 (2003); Waite v. Goal Sys. Intl., Inc., 55 Mass. App. Ct. 700, 705 (2002). The work in question is the practice of medicine. The majority acknowledges, as it must, the "certainly ample evidence that Bulwer's performance in the residency program fell short of expectations." Ante at    . MAH was fully entitled to conclude that a mixed performance was an unsatisfactory performance, especially for patients located in the wrong part of the mix.

Dvorak testified that "in my opinion, there is institutional racism at Mount Auburn Hospital." She was aware of only "one other black physician that remained on staff . . . besides myself"; but she was not aware of the hospital-wide diversity statistics during her employment.

Dvorak based her opinion of institutional racism on three grounds: (1) incidents of conduct by unidentified persons within the MAH buildings; (2) the administration's tolerance of several mediocre white physicians on staff; and (3) elimination of her position.

As to incidents, at unspecified times, unknown individuals had twice removed from her office door a diversity bumper sticker and had once left a piece of white supremacist literature in a staff room.

As to personnel, Dvorak cited three occurrences of preferential treatment of white staff physicians. In one instance, MAH had retained on staff a male psychiatrist whose clinical judgment she had criticized repeatedly over a five-year period. As a second, she cited the elimination of her own position by MAH in 2006 as racially motivated retaliation against her role as an outspoken black female insistent upon

clinical excellence.[15]  She did not specify any incident or personnel involved in that action.  As a third instance, she referred to MAH's retention of a physician whom she suspected as a white supremacist.  When MAH counsel asked for the basis of her suspicion, she responded that the physician had maintained a large American flag on his office wall.[16]

None of Dvorak's commentary qualifies as admissible evidence.  It is inadmissible, not on technical bases, but rather on multiple independently adequate grounds of lack of foundation, lack of relevance, and overriding prejudice.

As to foundation, she conceded that she had no knowledge of the medical merits of Bulwer's case in the CCC and AHC:

> Counsel for the hospital:  "But you will agree with me, you don't know the circumstances [of Bulwer's case in the CCC and AHC]."
>
> A.:  "I do not know the circumstances."
>
> Q.:  "But you believe it [racial bias by MAH] generically; you don't know the specifics of their concerns [about Bulwer's performance], right?"

---

[15] She believed that MAH had eliminated her position because "they really felt that they wanted someone else in the [reconfigured] position who could get along better with the people throughout the hospital."  She viewed that reason as "completely absurd" and "the only explanation" for the elimination of her position to be "racism."

[16] Dvorak testified, "[W]hite supremacists frequently have huge American flags as that denotes their, you know, white America mentality."

   <u>A.</u>:  "I do not know the specifics of their concerns, that
   is correct."

   As to relevance, she could not identify the perpetrators,
the time, or the circumstances of the events in MAH buildings,
nor connect them in any respect to the case of Bulwer.  Nor did
the retention of the allegedly mediocre white male psychiatrist
have any linkage to this dispute.  Her criticism of unidentified
passive MAH administrators had no bearing on the decision
terminating Bulwer's residency.  See <u>Brunner</u> v. <u>Stone & Webster
Engr. Corp</u>., 413 Mass. at 704, quoting from <u>Medina-Munoz</u> v. <u>R.J.
Reynolds Tobacco Co</u>., 896 F.2d at 10 ("The biases of one who
neither makes nor influences the challenged personnel decisions
are not probative in an employment discrimination case"); <u>Weber</u>
v. <u>Community Teamwork, Inc</u>., 434 Mass. at 777 (employee could
not establish discrimination based on events and conditions that
predated decisionmaker's arrival at employer because no evidence
that previous discriminatory attitude influenced decisionmaker).
See also <u>Bennett</u> v. <u>Saint-Gobain Corp</u>., 507 F.3d 23, 31 (1st
Cir. 2007), quoting from <u>Velazquez-Fernandez</u> v. <u>NCE Foods, Inc</u>.,
476 F.3d 6, 11 (1st Cir. 2007) ("[T]he discriminatory intent of
which [an employee] complains must be traceable to the person or
person who made the decision to fire him. . . .  When assessing
a claim of pretext in an employment discrimination case, an

inquiring court must focus on the motivations and perceptions of the actual decisionmaker").

Finally, Dvorak's broadsided "opinion" of MAH, her former employer, as a "racist" institution is blatantly inflammatory and prejudicial.  See Pina v. The Children's Place, 740 F.3d 785, 795 (1st Cir. 2014), quoting from Caban Hernandez v. Philip Morris, USA, Inc., 486 F.3d 1, 8 (1st Cir. 2007) ("Although we will draw all reasonable inferences in the nonmovant's favor, we will not 'draw unreasonable inferences or credit bald assertions, empty conclusions, rank conjecture, or vitriolic invective'").  These offerings do not present questions of credibility or weight for a jury, but only a question of law for a judge.  Dvorak's deposition testimony is an attempt to substitute a grudge for evidence.  As a matter of law, it is inadmissible in toto.[17]

(D)  Shifting explanations.  Finally, the majority's description of MAH's statements of reasons for nonrenewal of the residency ("poor performance in the internal medicine department") and for termination as reported to the Board of Registration in Medicine ("[f]ailure to make appropriate progress in processing and applying evaluations and other

---

[17] The motion judge correctly rejected Dvorak's deposition testimony as "bare assertions, understandings, beliefs or assumptions," with citation to Key Capital v. M&S Liquidating Corp., 27 Mass. App. Ct. 721, 728 (1989).

constructive criticism and feedback to patient care responsibilities") as potentially shifting and suggestive of pretext is untenable. As the survey of rotation evaluations and committee findings demonstrates, those expressions convey a consistent assessment of the grounds for unsatisfactory performance. The indicator of shifting explanations requires a significant inconsistency or apparent falsehood. See, e.g., Waite v. Goal Sys. Intl., Inc., 55 Mass. App. Ct. 700, 705 (2002).

iii. Discrimination summary. In sum, eight rotational evaluators independently identified common and continuing shortcomings. The program director, Bulwer's adviser, and the thirteen-member CCC concurred in those evaluations. The AHC of four senior physicians, after an expanded review, concluded that the deficiencies remained serious. The chair of the department of medicine concluded that the deficits risked patient safety.[18] The entire work of the physicians and committees is devoid of any reference to race or national origin. The minutes of the AHC's meetings reflect a special concern about the consequences of the proceeding for Bulwer's career.

---

[18] The physicians and the AHC recognized that Bulwer had received a number of mixed and favorable rotation evaluations and that his described weaknesses lay in three of the six core competencies, and not all six. The gravamen of concern was his persistence in those three deficiencies and his treatment of constructive criticism with obdurate resentment.

Against this body of evidence, Bulwer and the majority have not identified disparate treatment of any similarly situated individual. The record is devoid of comparators and devoid of any direct or circumstantial evidence of racial motivation by any participating MAH decisionmaker. The summary judgment record presents a case in which evidence of invidious intent is not merely insufficient, but rather nonexistent.

Perhaps most troubling is the majority's treatment of medical judgment. It purports to see beneath the accumulated layers of professional opinion some evidentiary clues of invidious behavior warranting a jury trial (e.g., failure of Flint and Balestrero to meet more frequently with Bulwer amid their duties; criticism of Bulwer's performance by Bial; comment about a resident's duties by Wellisch). Nothing in the record supports the characterization of these events as evidence of discrimination rather than the practice of medicine in a large teaching hospital. The majority's rationale is strangely skeptical of contemporaneous documented medical judgment, and even more strangely indulgent of hypothetical conspiracy theories.[19] Its entire discrimination analysis is an exercise in conjecture, not evidence. The record permits no reasonable

---

[19] The gist of the deposition testimony of both Bulwer and Dvorak was that white supremacists had infiltrated the decision-making positions of a major university teaching hospital.

expectation of proof of racially discriminatory conduct or pretext for such conduct.

2. Breach of contract claim. The majority believes that several claims of breach of the residency contract by MAH deserve a trial: (1) the failure to provide a nondiscriminatory workplace; (2) failure to provide Bulwer with required resources and supervision; (3) failure to provide him with adequate notice of specific patients or allegations considered by the AHC; and (4) omission of a resident from membership in the AHC. Ante at . For the following reasons, no triable issue of a material breach is present.

The claim of a discriminatory workplace depends entirely upon allegations of discrimination already discussed. That claim does not have the support of evidence creating a genuine issue of material fact.

Similarly, the alleged failure to furnish Bulwer with required resources and supervision lacks any basis in the record. This claim appears to rest upon the allegation that Flint and Balestrero failed to provide sufficient remedial support to Bulwer after delivery of his October, 2005, evaluations and his November conferences with them. The only specification of that claim is that Balestrero did not meet with him on a weekly basis in December, a problem which she attributed to his scheduling. That component was only one of

six elements of the December 1, 2005, remediation plan composed by the CCC. No evidence indicates that the remaining five elements did not go into effect for Bulwer's benefit (review of all his notes by a senior resident; monitoring of his case presentations by attending physicians; consultations by the CCC with his nurse managers; review of his December rotation by the CCC; discussion of his December evaluations and general standing by a CCC representative, Balestrero, and Bulwer). Bulwer's December, 2005, and January, 2006, evaluations appeared better, but his February, 2006, assessment plummeted.

At the first meeting of the AHC, Flint presented the reasons for nonrenewal: problems in the three core competencies and three illustrative cases from patient charts. Bulwer responded to the three competency concerns, requested and received permission to file responsive written material, and three days later submitted a fourteen-page reply with specific references to four patient charts and five admissions and progress notes. It is uncertain whether Bulwer received notice of the three illustrative cases first submitted by Flint. The AHC's provision of a full written rebuttal process cured any deviations from the notice requirement.

The AHC did not breach any contractual standard by the conduct of its second and third meetings. The contractual due process provision calls for the introduction of original

evidence in the presence of the resident.  Then, "[i]n reaching its findings and recommendations, the [AHC] <u>may meet with other persons and examine records</u>" (emphasis supplied).  The AHC followed that process as part of its deliberations here, as it invited to the second meeting the views of the additional physicians through whose departments Bulwer had rotated.  The third meeting consisted entirely of deliberative discussion.  Those proceedings were not unauthorized or secretive events, as persistently suggested by the majority opinion.  Contractual due process did not entitle Bulwer to attend the second and third deliberative sessions.  The AHC had begun deliberation at the close of the first session and then pursued it to completion.

Finally, the AHC did omit a resident or "house officer" from its membership.  Throughout the proceedings all participants appear to have been unaware of that contractual specification.[20]  The four members of the AHC eventually reached a unanimous decision.  The question remains whether the omission constituted a material breach harmful to Bulwer.  In these circumstances, it did not.

"In determining whether a failure to render or to offer performance is material, the following circumstances are significant:  (a) the extent to which the injured party will be

---

[20] The written AHC process does not call for the participation of attorneys.

deprived of the benefit which he reasonably expected; . . . [and] (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing."  Restatement (Second) of Contracts § 241 (1981).

Here the procedural deviation did not deprive Bulwer of a reasonably expected benefit (a different outcome).  Nor did MAH depart from standards of good faith and fair dealing.  The absence of a resident was an oversight, and not an evasion.  The minutes of the AHC hearings show abundant concern for a fair determination and for Bulwer's career.  The weight of information and the train of MAH procedures leading to the outcome left no room for a different result.

Conclusion.  The duty of a judge is to resolve a case on the basis of the presence or absence of evidence and the governing legal standards, not on the basis of speculation or preconception.  The Superior Court judge performed that duty fully and accurately.  I would affirm her entry of summary judgment in its entirety.